IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

SHARON JARRELL,

       Plaintiff,

v.                                        CASE NO. 1:09-cv-136-MMP/GRJ

MICHAEL J ASTRUE, Commissioner
of Social Security,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

      Plaintiff appeals from a final decision of the Commissioner of Social Security
("the Commissioner") denying her applications for a period of disability and disability
insurance benefits. (Doc. 1).   The Commissioner has answered (Doc. 9), and both
parties have filed briefs outlining their respective positions. (Docs. 14 & 21). For the
reasons discussed below, the Court recommends that the Commissioner's decision be
affirmed.

## I.  PROCEDURAL HISTORY

      Plaintiff filed an application for disability benefits on January 22, 2003, alleging a
disability onset date of February 1, 1999, due to chronic low back pain, degenerative
disc disease of the lumbar spine, chronic neck pain, and depression. (R. 51-59.)
Plaintiff's application was denied initially and upon reconsideration.  (R. 22-23).  Plaintiff
petitioned for a hearing before an administrative law judge (ALJ), who conducted a
hearing on April 17, 2006, and entered an unfavorable decision on August 29, 2006. (R.
558-68.)  The Appeals Council denied Plaintiff's request for review on June 29, 2007.

(R. 5-7.)  Plaintiff then filed a complaint for judicial review.  On motion of the Commissioner, this Court entered an order on March 25, 2008, remanding the case to the ALJ in order to obtain testimony from a vocational expert regarding whether Plaintiff could perform "other" work found in significant numbers in the national economy given her combination of exertional and non-exertional impairments.  (R. 576-78.)  Following a second evidentiary hearing on February 4, 2009, (R. 861) the ALJ  entered an unfavorable decision on April 4, 2009. (R. 549-57.)  This action followed.

## II.  <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole,

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which

---

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[11] Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12] Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden

---

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F.
3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of

---

for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

performing the "other work" as set forth by the Commissioner.

## III. SUMMARY OF THE RECORD

The Plaintiff's challenge focuses upon the ALJ's determination that Plaintiff's subjective complaints of pain were not credible, and the ALJ's asserted failure to pose a hypothetical to the VE that included all limitations stemming from Plaintiff's physical and mental health impairments. Therefore, the Court will focus its discussion of the record on those issues, as to the relevant time period for which benefits are claimed.

### A. Personal Background

Plaintiff was 54 years old at the time of the second evidentiary hearing and decision. (R. 866, 557.) She completed high school and received beauty school certification, security guard certification, and on-the-job training in a job where she taught software to chiropractors. (R. 884-85, 874.) The Plaintiff has not engaged in substantial gainful work activity during the period from her alleged onset date of February 1, 1999, through her last insured date. (R. 551.)

### B. Record Relating to Pain and Physical Limitations

Plaintiff began seeing Dr. John E. Vinsant after she slipped and fell on January 16, 1997. (R. 436). She reported pain in her neck, the base of the back, left ankle, right knee, some numbness in both feet, headaches, and depression. (R. 436). She also reported some numbness and paresthesia (usually non-painful burning or pricking sensation) of both hands. (R. 436). Dr. Vinsant noted tenderness in the cervical spine, restriction of motion, pain on motion, some spasm and pain radiating to both shoulders, and subjective pain, numbness, and paresthesia down to both hands. (R. 436). He

further noted negative tinel sign at the wrist and elbows.  (R. 436).   Dr. Vinsant

continued to treat Plaintiff  until August 18, 1997.  (R. 435).  This treatment consisted

primarily of electrical stimulation, heat packs and massage.   (R. 417).  Initially, he did

not feel Plaintiff was able to work because of her injuries. (R.425).  By March 17, 1997,

Dr. Vinsant concluded that Plaintiff could return to work as a security guard, because

her injuries were improving.  (R. 428).

In February 1997, Plaintiff presented to Dr. Paul Ginsberg for a neurological

consultation.  She complained of neck pain, headaches, back pain, and bilateral ankle

pain.  (R. 417).  Dr. Ginsberg noted that her neck pain goes into the trapezius muscles

bilaterally, but does not radiate into the arms.  However, he noted that she does

experience pain at the shoulders when she lifts her arms above the horizontal. (R. 417).

She has only 45 degrees of rotation of her neck both left and right.  She could side

bend 20 degree, flex 20 degrees and extend 60 degrees. (R. 418).  She had trigger

points in the trapezius muscles and splenius capitus muscles bilaterally. (R. 418).  She

had full range of motion of the arms at the shoulders, though she could not actively lift

either arm up high because of pain. (R. 418).  She had mild lumbar spasm, and

straight-leg raising test, while seated, was negative. (R. 418).  Her ankles were tender

upon moving, although more so in the left ankle. (R. 418).  Dr. Ginsburg also noted that

Plaintiff seemed depressed.  (R. 418).  Motor testing showed no definite weakness.

Muscle tone was normal with no atrophy. (R. 418).  Plaintiff had intact coordination and

reflexes. (R. 418).

In March 1997, Dr. Ginsberg noted Plaintiff was not as depressed as she was in

February. (R. 419).  He attributed her improvement to Paxil. (R. 419).  Additionally, her

headaches were getting better and were no longer a problem. (R. 419).  He noted her

neck and back pain were still present. (R. 419).  There was a left trapezius trigger point,

and 60 degrees loss of abduction and flexion of her left arm. (R. 419).  Internal and

external rotation were intact. (R. 419).  Her neck rotation improved to 60 degrees. (R.

419).  There were no trigger points in the lumbar region, although there was a definite

spasm. (R. 419).  She did not have classical sciatica nerve tenderness. (R. 419).  She

had intact strength in the lower extremities and reflexes intact and symmetrical.  (R.

419).

Dr. Vinsant discussed Plaintiff's nerve testing results with Plaintiff on May 23,

1997.  The results were found to be normal involving the C6-7-8 nerve roots but the

nerve conduction studies of the upper extremities revealed abnormal findings of the left

median nerve across the forearm suggesting neuropraxis.  (R.429).

On May 30, 1997, Plaintiff had an MRI of her cervical spine done because of her

neck and left arm pain.  The Impression included: !. Central disk herniation at C5-6

which appears to contact the anterior cord surface.  2.  Multi-level degenerative disk

disease without significant spinal stenosis or foraminal narrowing.  (R. 439).

An MRI of the lumbar spine was done July 11, 1997, because of trauma with low

back pain and to rule out herniated nucleus-pulpsosus (slipped-disk).  The Impression

states: "Prominent L5-S1 degenerative disk disease with mild disk bulge, and bilateral

facet and ligamentum flavum hypertrophic changes.  Mild narrowing of the left L5-S1

neural foramen." (R. 440).

Plaintiff had her final visit with Dr. Vinsant on August 18, 1997.  He believed

Plaintiff had reached her maximum medical improvement in reference to the injuries

she received January 16, 1997. (R. 435). He noted she was experiencing tenderness, though no spasm, in her cervical spine. (R. 435). She reported some pain and restriction of motion and bending of 30 degrees to both sides. (R. 435). Additionally, there was some mild pain radiating to the left shoulder. (R. 435). However, there was no numbness down the upper extremities. (R. 435). He noted negative tinel sign at the wrist and elbows. (R. 435). Plainitff's left sciatica continued down to the calf area. (R. 435). Her LS spine was tender and bending forward was just 45 degrees, and extension just ten degrees. (R. 435). He noted "these motions were painful but no definite spasm." (R. 435). Additionally, knee and ankle jerks were satisfactory. (R. 435). He did not believe Plaintiff was a surgical candidate at the time. (R. 435). Her nerve conduction studies were found to be normal. (R. 435). She was discharged "with a 10% permanent partial physical impairment in reference to the body as a whole as the direct result of the permanent injuries which she incurred on Jan. 16, 1997." (R. 435). Plaintiff was given a note to return to work, a prescription of Soma for muscle spasm, appropriate restrictions and precautions, and home exercises for her neck and back . (R. 435).

On January 26, 1998, Plaintiff's MRI was reviewed by Dr. Jimenez. Dr. Jimenez concluded that she did not need surgical intervention for neck and shoulder pain (R. 146). Plaintiff was referred to a pain clinic, physical medicine and rehab. (R. 146).

Plaintiff's medical records show there were only two medical visits during the period of February 1, 1999 to June 30, 1999. Both of these visits were to gynecology for routine exam and medication refill. (R. 140-41)

On July 21, 1999, Plaintiff met with Dr. Harris. Among other things, Plaintiff

reported chronic low back pain, neck pain and depression.   (R. 138).  Dr. Harris noted

that Plaintiff was not currently taking prescription medication for her chronic low back

pain.   (R. 138).  Dr. Harris also made an osteopenia finding on films.  (R. 138)  On

November 10, 1999, Dr. Harris made the following note: "Objective: NAD, neck pain

with forward flexion, and with pain with left lateral flexion, motor 5/5/, sen increased left

arm/hand. abd with central obesity. [L]eft knee, no effusion, crepitus." (R. 128).

Plaintiff was counseled to walk three blocks per day to reduce her BMI.  (R. 128).

On September 25, 2000, Plaintiff had an annual exam.  She reported complaints

of numbness in both of her hands and arms bilaterally.  (R. 374).  She also reported

complaints of her neck.  (R. 374).  Her brachial and patellar reflexes were equal and

within normal limits bilaterally.  She was able to walk heel-to-toe.  (R. 377).  The

strength of her upper and lower extremities was slightly weakened but equal bilaterally

(R. 377).  Range of motion of joints was within normal limits.  (R. 377).  Sensory was

grossly intact bilaterally (R. 377).  Her spinal alignment was also within normal limits (R.

377).

## C. Mental Impairments

On September 26, 1997, Plaintiff saw psychology intern Jennifer Nardozzi.  In

her psychology note, Nardozzi noted Plaintiff's crying and frustration with the VA. (R.

149).  She also noted the Plaintiff was feeling more depressed lately because of lack of

family and social support as well as difficulties in communicating with her husband.  (R.

149).  Nardozzi noted that Plaintiff anticipated her mood would improve when she

resumed work in November.  (R. 149).  Nardozzi saw Plaintiff again on October 20,

1997.   (R. 147).  Nardozzi noted Plaintiff's crying in session and that Plaintiff was

having problems with her husband.  (R. 147).  Plaintiff reported Elavil was not having

any effect.  (R. 147).  Nardozzi assigned Plaintiff the task of engaging in self-care

activities (R. 147).

On March 26, 1998, Dr. Lois Armstrong, a staff psychologist, conducted a MHC

Diagnostic Interview.  Dr. Armstrong diagnosed Plaintiff with Major Depressive Disorder

(MDD) but wanted to rule out cyclothymia and Post Traumatic Stress Disorder (PTSD).

(R. 144).  Plaintiff reported the following symptoms: sleep disturbance, decreased

energy, feelings of anger/irritability/sadness, guilt, increased tearfulness, loss of

pleasure including sexual desire, lack of interest in activities formerly enjoyed, and

lower self esteem.  (R. 144).  In this interview, Plaintiff stated she believed the origin of

her depression was her current family situation.  (R. 144).  Plaintiff also denied a history

of psychiatric problems.  (R. 144).   Additionally, Dr. Armstrong noted Plaintiff had tried

multiple anti-depressants.  (Paxil, Prozac, Elavil, Wellburtin) with reports of no benefit to

mood.  (R. 144).

On March 26, 1998, Plaintiff had a psychiatry medication maintenance session.

Dr. Boza noted Plaintiff suffers from chronic back pain, TMJ, is depressed, tearful, and

has some prominent Depressive and moderate PTSD symptoms.  (R. 438).  Dr. Boza

discussed the possibility of treating with Alprazolam 0.5 mgrs up to tid and Dr.

Armstrong suggested meditation techniques. (R. 438).

On July 21, 1999, Dr. Boza noted Plaintiff's history of panic and anxiety and that

her Alprazolam 1 mg was now up to tid.   (R. 139).

On November 10, 1999, Dr. Boza noted a psychiatric diagnoses: 300.00 Anxiety

disorder NOS with moderate characterological features (301, 5), Axis I (DMIV-ICDM),

GAF: 50 and condition "mild worsening." (R. 125). Dr. Boza listed the chief complaint on this visit as "reports bouts of anxiety, only fair control [with] Alprazolam, tearful at times." (R. 127). Dr. Boza noted the following psychiatric findings: present: tearful, fleeting affect, anxious, moderately disheveled. (R. 127). Plaintiff denied suicidality, homicidal thoughts, and substance abuse. (R. 127). There was no psychotic symptomatology, no cognitive deficit, and no memory impairment. (R. 127).

## D.    **Hearing Testimony**

Plaintiff testified that she lived with her husband and 14-year-old daughter at the time of the 2006 hearing. Prior to stopping work in 1999, she had worked as a receptionist/reservationist at a hotel, and as a hotel security officer. She also had previously worked as a manicurist and teaching a computer program to chiropractors. (R. 821-24.)

Plaintiff testified that she could not return to work as a security officer because of pain in her hands, shoulders, back, and hips. She testified to having neck pain every day, though no surgery had been recommended. She was unable to raise her arms all the way above her head, though she testified that five years previously she had been able to do so. She had not been helped by the pain clinic. She testified to having constant pain in both arms, shoulders to hands. She said that the pain was twice as bad as it had been in the past. Plaintiff had carpal tunnel surgery in both hands, but it was a "waste of time." (R. 828.) Plaintiff testified that she had had pain in her hand since she worked in a beauty salon. She had pain in her legs from a back fusion in 2002, and had used a cane since that surgery. She said that 10 years previously she would rate her back pain as 8 out of 10; at the time of the hearing it was 6. She had a

slip and fall accident in her daughter's daycare in 1997, and settled a personal injury claim in 1999. Her physician at the time gave her a 10% disability rating. (R. 830-34.) She went back to work, and her employers accommodated her by allowing her to sit and not walk around or do as much. They allowed her to work as a receptionist. (R. 842-43.) She would have emotional outbursts and become tearful a couple of times a day, because she was having problems at home with her husband's drinking and PTSD. (R. 844-45.) This was in the time frame of 1998-99. (R. 846) At least once a week she would become agitated with her co-workers. Her mental health was a factor in leaving the job. (R. 847.) Plaintiff testified that following her slip-and-fall accident, she had constant muscle spasms in both sides of her rib cage. She always had pain in her arms and hands while working as a receptionist, but she would work through it. (R. 849-50.) Between 1998 and 1999, she could comfortably lift maybe 20 pounds, and sit for about 10-15 minutes, then she would get up and walk around. (R. 852.)

With regard to her activities, Plaintiff testified that her husband did most of the cooking and housework, and they both did shopping. Her typical day was spent watching television. (R. 839-41.)

At the second evidentiary hearing on remand in 2009, Plaintiff testified that she left her job as a reservation greeter in 1999 because it was very stressful for her, and she cried all the time and had anxiety and tension. (R. 868.) She was unable to give orders to the security staff to check the property each night. At the time, she could sit for 10 or 15 minutes at a time and then she would have to get up due to back strain. Plaintiff reiterated that she had constant pain in her neck, hands, and back, and rated her pain as a "10" on a 1 to 10 scale. She took medication that only helped slightly.

She had difficulty concentrating.  She could not carry even five pounds due to pain.

After she stopped working, her daily activities were mainly staying around the house on

the couch or in bed.  She could do buttons and dress herself, but everything was with

pain.  (R. 870-79.)

The ALJ obtained the testimony of a VE. (R. 602, 883-90.). The VE  testified that

a hypothetical person who could perform light, simple, routine, repetitive work, could

perform Plaintiff's past relevant work as a manicurist or security officer. (R. 556, 888-

89.) The VE stated that those jobs were lower level, semi-skilled jobs that required

dealing with data rather than things, and the judgment and tasks involved in those jobs

were not particularly complex or varied.  (R. 888.)   A person who could perform

sedentary, simple, routine work could work as a manicurist, but not as a security guard

though the person could work as a gate guard.  The VE testified that there are

substantial numbers of gate guard jobs in the regional and national economy.  (R. 889-

90.)

## E.    Findings of the ALJ

The ALJ found that the Plaintiff did not engage in substantial gainful activity

during the period from her alleged onset date of February 1, 1999, through her last

insured date of June 30, 1999.  He found that the Plaintiff had the following severe

impairments: chronic low back pain, degenerative disc disease of the lumbar spine,

chronic neck pain, and depression.  Despite finding these severe impairments, the ALJ

found that the preponderance of evidence indicated that the Plaintiff had "manageable

functional limitations," and that there was "insufficient medical evidence prior to June

30, 1999, to conclude that the Plaintiff had disabling physical or mental limitations." (R.

552.)  The ALJ found that the severe impairments did not meet the Commissioner's

Listings.  He found Plaintiff's testimony, alleging a "totally disabling condition," not

persuasive.  Additionally, he found that the Plaintiff was capable of performing past

relevant work as a manicurist or security officer (gate guard) and that this work did not

require the performance of work-related activities precluded by the Plaintiff's residual

functional capacity.

## IV.  Discussion

Plaintiff argues that the ALJ erred by not granting her a presumption of credibility

with regard to her subjective pain symptoms.  Plaintiff further argues that the ALJ erred

by not posing a hypothetical to the vocational expert that comprised all of Plaintiff's

impairments.

## A.  The ALJ's Decision to Discount the Credibility of Plaintiff's Complaints of Pain Is Supported by Substantial Evidence.

Plaintiff argues that the ALJ improperly rejected her pain testimony.  In

evaluating a disability, the ALJ must consider all of a claimant's impairments, including

her subjective symptoms such as pain, and determine the extent to which the

symptoms can reasonably be accepted as consistent with the objective medical

evidence.[21]  Where, as here, an ALJ decides not to fully credit a claimant's testimony

about subjective complaints concerning the intensity, persistence and limiting effects of

symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the

---

[21] 20 C.F.R. § 404.1528.

record must be obvious as to the credibility finding.[22]  A reviewing court will not disturb a

clearly articulated credibility finding with substantial supporting evidence in the record.[23]

Here, the ALJ concluded that Plaintiff's medically determinable impairments

could reasonably be expected to produce the alleged symptoms, but her testimony

regarding the intensity and limiting effects were not entirely credible.  The ALJ based

this conclusion on review of the medical evidence, the arguments presented, and

Plaintiff's demeanor and testimony at the supplemental hearing.  The ALJ noted that

during the relevant time period, Plaintiff's medical treatment had been relatively

conservative and non-aggressive, and that during her testimony she was "able to attend

to the proceedings closely and fully, without any noted distractions, or overt pain

behavior.  She was able to respond to questions appropriately, and she lacked the

general physical appearance of a person who might have been experiencing prolonged

or severe pain."

As detailed above, the medical evidence showed that in August 1997, Plaintiff

was cleared to return to work following treatment for her slip-and-fall accident.  In

January 1998, Dr. Jimenez concluded that Plaintiff did not need surgical intervention for

neck and shoulder pain, and he referred  Plaintiff to a pain clinic, physical medicine and

rehab.  (R. 146).  There were no medical visits from February 1, 1999 to June 30,

---

[22] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Dep't of Health & Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence); Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

[23] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

1999, relating to Plaintiff's pain; during that time Plaintiff visited her gynecologist twice for routine exam and medication refill. (R. 140-41). In July 1999, Plaintiff complained of low back and cervical pain to Dr. Harris, but Plaintiff was not taking any medication for pain. In November 1999, Dr. Harris counseled Plaintiff to walk three blocks per day to help control her weight. On September 25, 2000, Plaintiff's brachial and patellar reflexes were equal and within normal limits bilaterally, she was able to walk heel-to-toe, the strength of her upper and lower extremities was slightly weakened but equal bilaterally, and she had normal range of motion. The ALJ cited a "clear paucity" of medical evidence in the record to support Plaintiff's claims, and review of the records for the time period during which Plaintiff alleges disabling pain supports that conclusion. The paucity of such evidence provides a specific and adequate reason for rejecting Plaintiff's subjective complaints of pain. As the ALJ found, the intensity of pain alleged by Plaintiff cannot reasonably be accepted as consistent with the objective medical evidence. In the face of the ALJ's clearly articulated credibility finding and the substantial supporting evidence in the record, the Court will not disturb such finding.[24]

## B.  The ALJ's Hypothetical Accounted for Plaintiff's Limitations

Plaintiff argues that the ALJ improperly relied on VE testimony that did not adequately describe the functional limitations associated with her mental and physical impairments. Because Plaintiff challenges the sufficiency of the hypothetical posed to the VE, Plaintiff also implicitly challenges the ALJ's assessment of Plaintiff's RFC.

The burden is on Plaintiff to show that her mental impairment significantly limits

---

[24] See Hale, 831 F.2d at 1012; MacGregor, 786 F.2d at 1054.

her ability to perform basic work activities.[25]   As sole support for her argument, Plaintiff

points to the November 1999 VA assessment that Plaintiff had anxiety disorder,

depression, and a GAF of 50, which Plaintiff argues indicates "serious" symptoms, or

an inability to keep a job.

The ALJ determined that although Plaintiff's record reflected treatment for

affective disorder and emotional difficulties, reportedly stemming from situational issues

with her family, there was insufficient evidence prior to June 30, 1999, to conclude that

Plaintiff had a disabling mental impairment.  In particular, he found that, as a result of

her mental impairments documented in the record, Plaintiff had no limitations in her

activities of daily living, mild restriction in her social functioning and maintaining

concentration, persistence, and pace with no episodes of decompensation during the

relevant time period.   From a mental standpoint, the ALJ determined that during the

relevant period Plaintiff retained the ability to remember and carry out simple

instructions and to perform simple, routine, and repetitive tasks.

The Court can discern no error in the ALJ's conclusion that there is insufficient

evidence to demonstrate that Plaintiff's mental conditions caused severe functional

limitations prior to June 30, 1999.  The VA report relied on by Plaintiff was made

several months beyond Plaintiff's last insured date.  Further, for a medical condition to

be considered "severe," it must constitute more than a "deviation from purely medical

---

[25] 20 C.F.R. § 404.1520(c). Basic work activities include: "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." Soc. Sec. Admin. Rul. 85-28.

standards of bodily perfection or normality."[26] Thus, a diagnosis of "depression" and/or "anxiety" does not necessarily compel the conclusion that the conditions are disabling.[27] Further supporting the ALJ's assessment is the fact that Plaintiff has never been hospitalized for mental health reasons, and the fact that Plaintiff attributed her emotional issues to marital problems stemming from her husband's disability and PTSD.   Accordingly, the record fully supports the ALJ's finding that Plaintiff's depression and anxiety did not cause anything more than mild limitations.

Moreover, the ALJ's hypotheticals to the VE assumed that Plaintiff was limited to work involving only simple, routine, repetitive tasks at the light exertional level and sedentary exertional level, and thus the hypotheticals adequately accounted for Plaintiff's mild mental limitations.   The VE noted that although Plaintiff's past relevant work as a manicurist and security guard were defined as "semi-skilled" jobs, they were lower-level semi-skilled jobs that vocationally did not require significant judgment or complex or varied tasks.  (R. 888-89.)

Plaintiff also conclusionally alleges that the ALJ's hypothetical did not account for Plaintiff's "severe" exertional impairments.  However, the ALJ's hypothetical limited Plaintiff's exertional level to "light", and the VE responded that Plaintiff retained the capacity to work as a manicurist or security guard/gate guard, characterizing these jobs as light to sedentary.  (R. 889-90.)  The medical records amply support the ALJ's

---

[26] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

[27] 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[t]here must be a showing of related functional loss" for a psychological disorder to be considered disabling).

determination that Plaintiff retained the RFC to perform at the light exertional level from February 1999 through June 1999.   (R. 852.)

## V. <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully **RECOMMENDED** that the decision of the Commissioner denying benefits to Plaintiff be **AFFIRMED.**

**IN CHAMBERS** at Gainesville, Florida, this 27th day of September, 2010.

*s/ Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**